GADSDEN v. UNITED STATES et al.
No. 2623.

District Court, D. Maryland.
Jan. 25, 1944.

Hillman & Hillman, of Baltimore, Md., for libellant.

Bernard J. Flynn, U. S. Atty., and C. Ross McKenrick, Asst. U. S. Atty., both of Baltimore, Md., and David A. Turner, Atty. Bureau of War Risk Litigation, of Washington, D. C., for libellees.

CHESNUT, District Judge.

In this case, the libellant, as widow and the declared beneficiary of her deceased husband, Philip Gadsden, is seeking to recover $5,000 on a seaman's war risk insurance policy. The respondents in the case are the United States of America, the War Shipping Administration and A. H. Bull & Co., a corporation. As no evidence was offered to show any liability on the War Shipping Administration or A. H. Bull & Company, the case will be considered only as against the United States.

The case has been submitted upon testimony and arguments of counsel and the court makes the following *findings of material facts* in the case.

### Findings of Fact

1. Philip Gadsden, a resident of Baltimore City who had been a seaman for some years, developed a serious heart ailment which disabled him while employed aboard the SS Jean and the SS Evelyn in 1940 and 1941. This necessitated his being hospitalized at the United States Marine Hospital, Baltimore, Maryland, from August 22, 1941 to September 11, 1941, for illness diagnosed and treated as "cardiac disease, valvular aortic insufficiency, syphilis tertiary; aortic insufficiency". He was further hospitalized there from October 4, 1941 to October 20, 1941 for similar disease. On October 20, 1941, he was certified as "totally disabled" and the prognosis by the physician at the hospital was "poor". On account of this he was paid $750. by "A. H. Bull & Co. Inc." and executed to it jointly with the A. H. Bull Steamship Co., the Bull Steamship Line and the Baltimore Insular Line, and the Steamships Jean and Evelyn, and any and all underwriters thereon a formal release, dated November 7, 1941.

2. On or about April 13, 1942, Philip Gadsden shipped on the SS Arlyn at the Port of New York for a voyage as cook and steward for wages of $135. per month. This vessel was then owned by the United States Government and operated by A. H. Bull & Co., as agents. On April 13, 1942, apparently when first joining the SS Arlyn as a member of the crew, he designated his wife, Rebecca Gadsden, 1217 N. Bond Street, Baltimore, Maryland, as the beneficiary of his war risk life insurance. The voyage of the Arlyn from New York commenced April 14, 1942. On May 19, 1942, the vessel arrived at Tampa, Florida, and on that date the master of the ship certified to the medical officer in charge of the United States Public Health Service at Tampa, that Philip Gadsden served aboard the above vessel from April 13, 1942, to date. Gadsden was then furnished hospitalization at the United States Public Health Service Relief Station, Tampa, from May 19 to May 29, 1942, at which time his diagnosis was "cardiac renal and syphilis". The hospital record as to his condition upon admission stated "patient complained of shortness of breath and swelling of feet. Moist rales throughout lung area. Blood came back 4 plus". On May 29, the patient was discharged from Tampa with the notation "Patient transferred to Marine Hospital, Savannah, Georgia, no change in condition". However, in fact Gadsden did not go to the hospital at Savannah, but some time in June or July 1942, came by train to Baltimore and went to his home where his wife, the libellant in this case, testified he arrived in an apparently very ill condition. He was subsequently treated for a while, apparently by daily visits only, at the Marine Hospital in Baltimore. But on July 15, 1942, he was there hospitalized from July 15, 1942 to August 17, 1942. The diagnosis of his condition at that time was "aortic regurgitation, syphilis, tertiary, cardiac disease,—dilation with congestive heart failure, cardiac disease, hypertropy-arterial hypertension." His condition upon

admission was stated as follows: "The patient was last admitted to this hospital on July 15, 1942, with respiratory distress and considerable edema of the feet and ankles. We considered him first as in congestive heart failure and treated him accordingly." His condition on discharge on August 17, 1942, was stated as follows: "Following this treatment the patient responded slowly. His cardiac compensation was finally established and he was discharged from the hospital on a maintenance dose of digitalis," notation being made that no further hospitalization was necessary. The patient was considered permanently and totally disabled and the prognosis was "poor". Gadsden returned to his home at 1217 N. Bond Street, Baltimore, where he died September 4, 1942. His death certificate from the Baltimore City Health Department shows that he was a colored male 55 years of age, occupation seaman, and that the immediate cause of his death was cardiac failure due to aortic insufficiency. The certificate contained blanks for the insertion of the data in the event the death was due to external causes, including blanks as to (c) where did injury occur, (d) did injury occur about home, on farm, industrial place, public place—while at work, and (e) means of injury. None of these blanks were filled in. The certificate was signed by Hugh B. McNally, Medical Examiner.

3. The statutory authority for merchant seamen's war risk insurance is to be found in the Merchant Marine Act of 1936 as amended, 46 U.S.C.A. § 1101 et seq. Section 1128a authorizes the United States Maritime Commission to insure—"(e) Masters, officers, and crews of such vessels and other persons employed or transported thereon against loss of life, personal injury, or detention by an enemy of the United States following capture". Section 1128g authorizes the authority conferred upon the Commission by sections 1128–1128h to be exercised by the Administrator of the War Shipping Administration. Section 1128h authorizes the War Shipping Administration to insure persons and property directly. Pursuant to this statutory authority the government, through proper agencies, authorized personal insurance for crews of merchant vessels documented under the laws of the United States, in the amount of $5,000. in certain areas. By a ruling made February 6, 1942, the Maritime Emergency Board supplemented its decision providing for such personal insurance by prescribing the form of controlling policy. This policy form constituted group insurance "for the account of the masters, officers and crews of the American vessel-called—" during the voyage commencing on or about a certain date, payable in case of claim in accordance with the following schedules and in funds current in the United States. A copy of this policy form was produced at the trial by counsel for the government. It will be referred to more fully hereafter. It was provided in the policy form that payments if due should be made directly to the members of the crew or, in case of death, to his beneficiary designated at the time he signed on.

4. Libellant's claim is only for the sum of $5000. for the death of her deceased husband. No claim is made for accident, injury, sickness or other cause except for his death. It will have been noted from the above that his death did not occur during the voyage of the Arlyn; but more than three months after he had been first hospitalized at Tampa. The only evidence in the case as to what transpired affecting him while he was on the Arlyn consisted of statements made by him to his wife and two daughters on his return to Baltimore, and his narrative statement contained in the "history" given by him when he was last admitted to the Marine Hospital at Baltimore. These statements of the deceased seaman were objected to by counsel for the government and admitted only subject to exception. If not legally admissible for the purpose of proving facts narrated by the seaman, counsel for the libellant frankly conceded that he has no basis for recovery in this case. Counsel for the government also contends that even if the statements were admissible and constituted sufficient proof of the facts, there is no proper claim under the provisions of the policy.

5. The substance of the statements made by the deceased seaman, as testified to by his wife and daughters, was to the effect that on April 20, 1942, while the Arlyn was at sea in a convoy, a submarine alarm was sounded on the vessel, after word had been received that another ship in the convoy had been sunk by a submarine. Gadsden said that this "badly scared" him and he felt a sinking sensation as if his heart had dropped into his stomach, and that he collapsed and was taken to his bunk by another or other members of the crew and

was completely disabled from that time until he was discharged from the ship at Tampa on May 19, 1942. There was no confirmatory evidence of any kind of the seaman's verbal statements. Counsel informed the court at the trial that subsequently the Arlyn had been lost at sea, from a cause not stated, and that some of the crew had been lost; but the majority, including the master, had been rescued; that an effort had been made to find and interview surviving members of the crew but their addresses could not be learned, except that the master of the ship was on another voyage and unavailable as a witness. Presumably the ship's logs were also lost with the ship.

The conclusion of law is—

1. That there is no legally competent evidence that the death of Philip Gadsden was due to the risk covered by the policy, and

2. That the libel must be dismissed.

## Opinion

 The first question in the case is whether the hearsay statements of the insured seaman were admissible in evidence for the purpose of proving the fact that he had been "badly scared" by the submarine alarm on the ship; and that this possibly disabled him thereafter until his death. I have concluded that his statements under all the circumstances, considering the time when made in relation to the alleged occurrence and the nature of the effect on him of the submarine alarm, essentially subjective in character, were not legally admissible to prove the alleged fact.

The verbal statements were not made until nearly two months after the narrated occurrence. They were not therefore made under the immediate influence of the occurrence. The principles governing the admissibility of such evidence were fully stated in this Circuit by Judge John J. Parker in Chesapeake & O. R. Co. v. Mears, 4 Cir., 64 F.2d 291, 293, where it was said: "While a logical basis is not always given for the decisions, the cases almost uniformly hold that a statement made by an injured person as to the cause of his injury is admissible if the time which has elapsed since the injury is so short that he is still under the influence of the happening and his statement presumptively a spontaneous expression growing out of it and not the result of reason and reflection." It may be difficult in some cases to deter-

mine with nicety just where to draw the line in point of time between the occurrence and the narration of it in order to determine the admissibility of the statement; but in this case it seems very clear that the interval was entirely too long to permit the admissibility of the evidence, especially in view of the entire absence of any corroboration either direct or circumstantial, and also in view of the nature of the alleged injury. Some recent cases supporting this view are Krug v. Mutual Ben. H. & A. Ass'n, 8 Cir., 120 F.2d 296; Hartford Accident & Indemnity Co. v. Olivier, 5 Cir., 123 F.2d 709. See also 32 C.J.S., Evidence, § 417, pp. 45 et seq. As this suit is in admiralty and not at law or in equity, rule 43 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c which makes evidence admissible under the rules of evidence applied in the courts of the state, is not applicable. But the Maryland decisions on this point of evidence are not substantially different from the federal rule which is here applicable. See Spence v. Bethlehem Steel Co., 173 Md. 539, 197 A. 302.

 With regard to the statements made to the seaman's wife and daughters, counsel for the libellant seeks to justify the admissibility of the evidence on the ground of the further statements made by the witnesses that their husband and father repeated the statement several times and especially when they said he knew his physical condition was such that he would soon die. But this is a civil and not a criminal case and therefore the statements were not admissible as dying declarations by nearly wholly uniform authority. See Vol. 3, Wigmore on Evidence, 2d Ed., § 1432, pp. 163, 164.

 With respect to the seaman's statement given in his history when admitted for the last time to the Marine Hospital in Baltimore on July 15, 1942, the question here is not whether the hospital record is admissible as such, but only whether the seaman's statements as to having been badly scared is of itself relevant and admissible as proof of the alleged fact. In this Circuit the cases of United States v. Wilson, 4 Cir., 50 F.2d 1063, Flannagan v. Provident L. & A. Ins. Co., 4 Cir., 22 F.2d 136, and Long v. United States, 4 Cir., 59 F.2d 602, are authority against the admissibility. To the same effect is United States v. Balance, 61 App.D.C. 226, 59 F.2d 1040. Cf. Meaney v. United States, 2 Cir. 112 F.2d 538. See

also Model Code of Evidence A. L. I., pp. 231, 262, 264.

█ But even if the evidence was properly admissible the libel in this case would fail because there is no satisfactory or convincing evidence that the seaman's bad scare caused his death or materially contributed thereto. The attending medical officer at the Baltimore hospital was unable to express any opinion about this, and it would be very unsatisfactory indeed to accept the seaman's own statements as to his condition as sufficiently reliable to predicate thereon a conclusion that his death was caused by the scare. The hospital records and medical testimony were to the effect that his condition in 1942 was much the same as it had been in 1941. The attending hospital medical officer testified that when Gadsden was discharged in 1941 his heart condition was such that it was impossible to say how long he would live. When he returned to the hospital in July 1942 his condition was apparently more acute in certain respects but this acute condition had apparently abated on his discharge some weeks before his death.

█ But beyond this I think the contention of counsel for the government is correct, that the case in any aspect does not fall within the coverage of the policy. It is a long document of four typewritten pages but may be analyzed and summarized as follows: It covers the master and crew of the named vessel during a particular voyage "beginning, in respect to each person covered hereunder, from the time such person signs the articles for the aforesaid voyage * * * and continuing until such person is discharged or the termination of the aforesaid voyage * * * whichever may first occur." With this limitation as to the time the main provision of the policy, under which the libellant claims, insured "Against loss of life and bodily injury * * * directly occasioned by capture, seizure, destruction by men of war, piracy, takings at sea, arrests, restraints and detainments *and other warlike operations* * * * and acts of kings, princes and peoples in prosecution of hostilities," etc. (Italics supplied) By schedule 1 the maximum sum payable is $5,000 and by schedule 2 this maximum sum is payable in the event of loss of life or both hands, both arms, both feet, both legs, or both eyes, and with smaller sums in the event of less extensive injuries. The policy then provides "Indemnities referred to

above are payable, provided loss results directly and exclusively from bodily injuries, within 90 days from the date of the accident." The death of the insured in this case occurred more than 90 days from April 20, 1942, which is the date fixed in his statement as the time when he was badly scared by the submarine ' menace. Schedule 3 further provides for certain monthly instalment payments, for accidental injury not described in schedule 2 which, within 90 days from date of accident from a cause hereinbefore set forth results in total disability, etc., but the libellant makes no claim under schedule 3. It should also be noticed that the next to the last sentence · of schedule 3 reads as follows: "This insurance, however, does not cover illness or disease of any kind (except pyrogenic infections which shall occur from an accidental cut or wound), nor any disability due to or arising from mental and/or nervous disease." As a matter of construction, this sentence in its particular context may possibly modify only the liability assumed for accidental or bodily injury for which no claim is now made, and counsel for the libellant so contends. But the sentence cannot be entirely disregarded as it seemingly emphasizes what is otherwise the proper construction of the policy so far as the claim in this case is concerned, as limited to loss of life and bodily injury resulting from the war risks specified. The weight of the evidence in the case shows that the death of the deceased was due to disease and not to a war risk. The policy is generally described and referred to as "war risk insurance". It is also very doubtful indeed whether the aggravation of the heart disease *from which the seaman in* this case was suffering, by being badly scared by the submarine alarm would constitute a "bodily injury" within the fair meaning of the policy. See 11 C.J.S., Bodily, 376, 377.

█ Counsel for the libellant contends that the policy should be very liberally construed even beyond the ordinary federal rule that ambiguities in insurance policies are construed most strictly against the insurer. It is doubtful if the principle on which this rule of construction is based is applicable here where there is no contention that the insured relied in any way upon his interpretation of the meaning of the policy, of which indeed he never had or saw a copy. The contention for the most liberal construction is based on the

general policy of liberal treatment of seamen in admiralty, and in this connection counsel particularly refer to the passage by Congress (approved March 24, 1943) of chapter 26, Public Law 17, H. R. 133, 57 Stat. 45, entitled "An Act to amend and clarify certain provisions of law relating to functions of the War Shipping Administration, and for other purposes." And reference is also made to Senate Report No. 62, February 22, 1943, preceding the last mentioned Act. For convenience this Senate Report may be found in United States Code Congressional Service of 1943, No. 1, pp. 2–10 and 2–13, where it was said: "Insurance protection for Seamen.—Another problem primarily affecting seamen and their dependents is the need of providing more complete protection to seamen and their dependents in case of loss of life or bodily injury to such seamen. Notwithstanding the apparent intent of Congress to provide adequate insurance protection under the revision to the War Risk Insurance Act approved April 11, 1942 (public law 523, 77 Cong.), it appears that amendment is necessary to avoid the danger of a denial of insurance benefits in cases of death or injury arising from war conditions not within the strict interpretation of 'war risks'. That term was, of course, not intended to be construed in its most limited and technical sense but rather as commonly understood to cover all risks arising out of the war." By subsection (h) of the amending statute (H. R. 133, above referred to) it is provided—"3. The term 'risks of war' shall include those losses which, in accordance with commercial practice prevailing from time to time, are excluded from marine insurance coverage under the 'free of capture and seizure' clause or clauses analogous thereto." 46 U.S.C.A. § 1128e (f) (3). Counsel for the government points to this last mentioned subsection of the Act as carrying out the recommendation made in the Senate Report above referred to. The particular language in the statute, H. R. 133, on which counsel for the libellant relies, reads as follows: "Any claim, right, or cause of action of or in respect of any such seaman accruing on or after October 1, 1941, and prior to the date of enactment of this section may be enforced, and upon the election of the seaman or his surviving dependent or beneficiary, or his legal representative to do so shall be governed, as if this section had been in effect when such claim, right, or cause of action accrued, such elec-

tion to be made in accordance with the rules and regulations described by the Administrator, or Shipping Administration. Rights of any seaman under the Social Security Act, * * * as amended by subsection (b) (2) and (3), and claims therefor shall be governed solely by the provisions of such Act, so amended." 50 U.S.C.A. Appendix § 1291(a). But if the whole of the paragraph from which the above quotation is made is read, it does not appear that the sentences quoted apply to the situation with which we are here dealing.

In this connection it may also be mentioned that subsequent to the death of the seaman in this case the War Shipping Administration or its Administrator, has adopted a new form of policy applicable to seamen's war risk insurance. It is a very lengthy document and is said to be more liberal to the seamen than the form with which we are here concerned. It was also stated by counsel that by the administrative ruling contemporaneous with or subsequent to the formulation of the new policy form, seamen joining ships while the former policy form was in effect, and sustaining injuries after the latter form became effective, are permitted at their election to make claim under either the earlier or the later form of policy; but it was further stated that this administrative ruling was not made retroactive prior to March 15, 1943. But even if the libellant would be entitled to claim the benefit of the more liberal new policy form, that is immaterial in this case because counsel for the libellant has not been able to point to any particular provision of the new policy which would justify recovery in this case.

■ I am quite in accord with the general proposition that seamen's rights in admiralty should be liberally construed and enforced, and the circumstances of this case naturally evoke sympathy for the libellant in view of the fact that the seaman apparently responded to an invitation for further service to the government at a time when he was really physically disabled and should not, in view of his physical condition, have undertaken this further service. There was testimony from the seaman's widow that he shipped on the Arlyn in response to a telegram from the Bull Company, and counsel for the libellant has contended that as the Bull Company must have known his physical condition, they

should not have accepted his services at all. However, there is no evidence in the case to show that he was unduly persuaded or that he entered upon further seaman service otherwise than voluntarily. Nor does this contention seem material in construing and applying the policy provisions.

Counsel may submit in due course an order for the dismissal of the libel.