**MURPHY v. UNITED STATES, War Shipping Administration.**

**No. 133.**

District Court, E. D. Pennsylvania.

March 20, 1946.

Gerald A. Gleeson, U. S. Dist. Atty., of Philadelphia, Pa., and Charles R. Sheidy, Jr., Asst. U. S. Dist. Atty., of Reading, Pa., for petitioner.

Freedman, Landy & Lorry and Abraham, E. Freedman, all of Philadelphia, Pa., for respondent.

WELSH, District Judge.

This is an action by an American merchant seaman to recover the proceeds of War Risk Insurance for injuries under the rules and regulations of the Maritime War Emergency Board.

### Findings of Fact

1. The plaintiff, Edwin J. Murphy, an American merchant seaman, was engaged on or about September 29, 1942, by the defendant as an able seaman on board the defendant's steamship "Gulf Maracaibo", for a voyage from Chester, Pennsylvania, to undisclosed ports anywhere in the world and return, for a period of twelve months.

2. The "Gulf Maracaibo" left for Hampton Roads, Virginia, on or about October 2, 1942, and was delayed at the latter point for about nineteen days waiting for Naval orders and convoy.

3. The vessel sailed southbound on or about October 21, 1942, in convoy and under the direction and control of the United States Naval authorities.

4. The vessel was manned by a crew of American merchant seamen and also by a Naval gun crew under the command of Naval Ensign Quinlan.

5. The Naval Ensign had complete control over the vessel with respect to security regulations which included blacking out of the vessel.

6. In furtherance of his duties, Naval Ensign Quinlan caused all lights to be removed from passageways and all doorway entrances and completely blinded all doorways by removing the lights and caus-

ing blackout curtains to be extended across the doorways including the four doorways on the midship deck below the wheelhouse.

7. The midship deck was about nine feet wide with a roof overhead; it was enclosed except at the forward end; there were four doors opening out into the midship deck; starting from the port side the first door led to the port passageway where the officers' quarters were located; next was the door to the hospital room; next to that was the doorway which opened out to the shelter deck about nine feet below; there was a metal ladder leading from this doorway down to the deck below; next to that door was the fourth and last door which opened into the starboard passageway where the quartermaster's quarters were located.

8. On October 23, 1942, while the vessel was in convoy, southbound under the control of the Navy, plaintiff was on lookout up to about 7:40 p.m. when he was directed to go below to call the next watch.

9. Plaintiff descended to the midship deck for the purpose of calling the third mate and the quartermaster about 7:40 p.m. on the 23rd day of October; at that time the midship deck was in total darkness; all the lights had been extinguished and blackout curtains were in position across all four doors; plaintiff was proceeding to call the quartermaster and was groping his way with his fingers on the bulkhead trying to locate the door to the starboard passageway. He stepped into the doorway which he thought led to the passageway but which was actually the doorway to the ladder leading to the shelter deck. As he stepped in and parted the blackout curtains, he lost his balance on the narrow ledge at the top of the ladder and fell down to the shelter deck below.

10. As a result of the blackout, plaintiff sustained the following injuries: fracture, comminuted head of humerus, left, dislocation, humerus head, left, Neuritis, Traumatic, Ulnar nerve, left, and a permanent disabling weakness of the left shoulder.

11. Plaintiff obtained his first employment as a platform man for the American Railway Express in September, 1943; he was unable to perform the duties incident to this job and had to leave the employment after three or four weeks; thereafter, he went to work for the Pennsylvania Railroad as a brakeman about the middle of November but had to leave this job also because he was required to hold on to the car with one hand while he signalled the engine. In the course of this work his arm would become weak and tired and almost paralyzed. Plaintiff has also acted as a relief mate in port for about five days.

12. Plaintiff now has a permanent weakness in his arm which will prevent him from performing the job of able seaman which requires climbing aloft, pulling, lifting and manual labor requiring full use of both hands.

13. Plaintiff had not returned to sea for fifteen months prior to the date of the rendition of the testimony, and, it is found as a fact that he will be disabled for a period during his future lifetime that will be in excess of the period required to entitle him to the principal sum of $5,000.

## Discussion

The Maritime War Emergency Board was created shortly after the outbreak of the war and its first order provided that each member of the crew of any merchant vessel documented under the laws of the United States should be insured against loss of life due to "risks of war or warlike operations" in the amount of $5,000. By a subsequent order, the scope of the insurance required was extended to cover bodily injuries as well as death, and the terms of the policy were expressly prescribed. This latter policy provides inter alia against bodily injury "directly occasioned by capture, seizure, destruction by men of war, piracy, takings at sea, arrests, restraints and detainments and other warlike operations, * * *."

The defendant argues that the plaintiff is not entitled to the benefits of the War Risk Insurance because the facts relied upon by the plaintiff do not constitute a war risk or warlike operation. This problem was before me in Crist v. United States of America, War Shipping

262

Administration, 64 F.Supp. 934, and I am of the opinion that the two cases are sufficiently similar as to make the views expressed in the Crist case, supra, applicable to the case at bar. The "restraint" as provided for in the policy is clearly established from the fact that the ship was travelling in convoy under rigid blackout regulations under the direction and control of the Naval authorities. It is also my opinion that the restraint imposed by the Naval auhorities by blacking out the ship was the proximate cause of the plaintiff's falling from the midship deck to the shelter deck and sustaining the injuries. It is difficult to perceive the happening of the accident which is involved here if a blackout were not in effect for ordinarily the ship would have been well lighted and the plaintiff would readily have observed the entire surroundings and chosen the starboard passageway instead of the doorway which opened out to the shelter deck. Finally, the Court is satisfied that the accident does not fall within the expressed exception in the policy to the effect that "nothing herein shall be construed to cover claims by any member of the vessel's personnel arising from his own willful misconduct". At most the plaintiff was guilty of an error of judgment.

With regard to plaintiff's injuries and damages the court adopts and incorporates in this discussion its special findings Nos. 10, 11, 12, and 13.

Conclusions of Law

1. The S. S. "Gulf Maracaibo" at all times relevant herein was in convoy as required by the military authorities and under the direct control of the United States Navy.

2. The vessel at all times herein was under restraint of the United States Navy.

3. The restraint and control exercised over the vessel by the United States Navy in the prosecution of the War, was a proximate contributing cause of the plaintiff's injuries.

The prayer of the libel is accordingly granted and an order may be entered.