**QUINN v. UNITED STATES.**

No. 390.

District Court, Hawaii.

May 23, 1947.

Gladstein, Anderson, Resner, Sawyer & Edises of San Francisco, Cal. and Harriet Bouslog and Myer C. Symonds, both of Honolulu, T. H., for libelant.

Ray J. O'Brien, U. S. Atty., Dist. of Hawaii, and Edward A. Towse, Asst. U. S. Atty., Dist of Hawaii, both of Honolulu, T. H., for respondent.

McLAUGHLIN, District Judge.

This is a suit in admiralty by the widow of Frederick Quinn, an American seaman who disappeared from his ship while the vessel was enroute from San Francisco to Honolulu. At the time the ship was part of a wartime convoy and was operating under blackout conditions imposed by the Navy. The libelant seeks to recover for the loss of her husband's life under a war risk insurance policy. 46 U.S.C.A. §§ 741 to 752 and 1128 to 1128f.

The key question is whether or not the blackout conditions imposed upon the convoy by the Navy as a war measure can be said in point of law to be the proximate cause of the loss of life of a man who was last seen in the mess hall of the ship, and, having finished his coffee, then left presumably to go aft to his bunk to sleep.

The known facts are not in dispute and are recorded here as general

### Findings of Fact

1. The libelant was the lawful wife of Frederick Quinn on November 10, 1944, and the sole designated beneficiary under his war risk insurance policy. Since Quinn's disappearance at sea the libelant has remarried.

2. Frederick Quinn, a citizen of the United States, was an able bodied seaman and on November 10, 1944, a member of the crew of the S. S. Maunswili, a vessel of United States registry then owned by the United States and operated by the Matson Navigation Company as general agent for the War Shipping Administration.

3. Quinn had made several voyages as a crew member of this ship and was highly regarded by the captain as a steady, dependable seaman. On the voyage in question—No. 28 W.S.A.—the crew was in complete harmony and Quinn was popular and a person with a happy disposition.

4. The ship at the time in question, approximately 10:30 p.m. on the night of November 10, 1944, was proceeding in convoy, under control of the Navy, to Honolulu with a general cargo consisting of food stuffs, mobile units, piles, an ice house and assorted supplies. No enemy action was encountered during the voyage.

5. On the night in question the entire convoy, including this vessel, operated by direction of the Navy under total blackout conditions. The ship's log recorded conditions during the 8 p.m. to 12 midnight watch as:

Wind NNW, Force 6, Rough Sea, Clear to Overcast. O'Cast and Cloudy. Rough Sea and Heavy Swell. Vessel Rolling Heavily. Shipping Occasional Seas on Strd. Side.

6. The vessel carried a lashed deck cargo between the midships house and the aft part of the ship. It consisted of barrels atop which was piled lumber. The deck cargo extended almost to the rail. On top of the lumber on the starboard side about 10 feet from the ship's rail was built a catwalk to aid the crew in reaching its quartres aft without stumbling or slipping. The deck cargo was piled to a height of approximately seven feet above the deck. A ladder was located at each end of the catwalk. The catwalk was about three feet wide, was made of wood, and had a single hand rail three feet high of wood or rope on the outboard side only. No complaints were ever registered by the crew against the catwalk, and it was found by the Coast Guard upon subsequent inspection to be safe and adequate. It was found to be in good condition on the morning following the night of Quinn's disappearance.

7. To get at night from the mess hall quarters, two ways were available: one over the unlighted deck via the catwalk and the other—an inside lighted but devious route—via the engine room, the shaft alley, and then up a Jacob's ladder to the crew's quarters. No orders to use one way instead of the other had ever been issued. However, the captain had orally requested the crew to use the engine room route in heavy weather.

8. Quinn was last seen about 10:30 p.m. November 10, 1944, in the ship's mess hall. There he had had coffee, and while drinking it had been talking to fellow crew members. Soon after finishing his coffee, he said goodnight, left the mess hall, and was never seen again, nor has his body ever been recovered. He was first discovered missing when about 3:40 a.m. a call went out for him to report for the 4 a.m. to 8 a.m. watch. A search of the ship early November 11, 1944, revealed no trace of him nor any evidence of foul play. The Coast Guard's search of the vessel when it arrived at Honolulu was to the same effect.

Additionally it appears that a crewmember was in his own bunk from 9:30 p.m. on the night of November 10 and remained awake until about 11:30 p.m. but never saw Quinn come into the crew's quarters.

From these facts the following are by permissible inference deduced as

### Special Findings of Fact

A. When Quinn left the lighted mess hall to go to his quarters, he proceeded aft in the blackout via the catwalk atop the deck cargo.

B. While traversing the catwalk in the total blackout at a time when the sky was clear to overcast with no moon shining, while the sea was rough and the vessel rolling heavily and shipping occasional water over the starboard side where the catwalk was but 10 feet from the ship's rail, Quinn lost his footing and either fell or was swept into the sea.

C. Quinn is dead as a result of drowning at sea.

D. Had it not been for the rigid blackout, Quinn would not have lost his life. The blackout prevented his seeing a secure object to which to hold fast until he recovered his footing or called for help, and it also precluded his being seen going overboard by the lookout and rescued from the sea.

### Comment

The respondent suggests suicide, murder, or that Quinn went through the engine room and being caught in a machine, the machine consumed his body without trace. No one of these inferences are warranted by the known facts.

 In the first place, suicide can be ruled out for two reasons: first, Quinn was known to be of a happy disposition and he was enroute home, and secondly, there is a presumption against suicide. Franklin Life Ins. Co. v. Heitchew, 5 Cir., 146 F. 2d 71, certiorari denied 324 U.S. 865, 65 S.Ct. 914, 89 L.Ed. 1421.

As to murder, this too is ruled out of consideration by the captain's testimony that the crew was in harmony and Quinn one of its popular members and no evidence of foul play was discovered.

Greater stress is placed, however, upon the idea that as a prudent man Quinn would have elected to go aft by the engine room route. Respondent would then account for the lack of a trace of his body by suggesting that in passing through the engine room he got caught in a machine and it totally consumed his body. Neither proposition squares with the undisputed facts or reasonable probabilities. The suggestion that perhaps a machine consumed Quinn without trace is absurd to begin with. And it is basically unlikely that Quinn went over the devious, cumbersome engine room route. It is more in accord with both logic and experience to infer that being an experienced seaman Quinn took the shortest way over the catwalk. Going the other way involved going down to the engine room, through it, along the shaft alley and then climbing up a Jacob's ladder to the crew's quarters. Not only is it unlikely that he would elect to take this route, but in all probability he would have been seen by the black gang necessarily on duty in the engine room.

So it is that I have found as an inferable fact that Quinn went aft over the catwalk, which was determined by the Coast Guard to be safe and adequate.

In point of law the blackout under the conditions described by the facts was a warlike restraint within the meaning of Article 3 of Quinn's war risk insurance policy, which expressly insures against " * * * loss of life * * * of the insured, directly and proximately caused by risks of war and warlike operations, including restraints * * * in the prosecution of hostilities * * *." See Gadsden v. United States, D.C., 54 F.Supp. 151, at page 155, holding that these policies issued under 46 U.S.C.A. § 1128 et seq. are to be liberally construed in favor of seamen. Here, however, resort to a liberal construction is not necessary to warrant a holding that this blackout was a warlike restraint, for it was imposed upon all vessels in the convoy to minimize detection by the enemy.

The existence of a warlike restraint in and of itself will not, however, enable a libelant to recover. It is necessary to further establish that the warlike restraint was in the words of the policy the direct and proximate cause of the loss. The authorities reveal that not only is the policy in general to be liberally construed, but specifically proximate cause in cases such as this is to be liberally interpreted. Crist v. United States War Shipping Administration, D.C., 64 F.Supp. 934; Murphy v. United States, D.C., 66 F.Supp. 260; and Reinold v. United States, D.C., 72 F.Supp. 92, 1947 A.M.C. 267.

Liberally construing proximate cause then and Special Findings of Fact A, B, C, and D incorporated into this comment being sanctioned by the doctrine of permissible inferences set forth and explained in Marra Bros., Inc. et al. v. Cardillo, D.C., 59 F.Supp. 368, affirmed, 3 Cir., 154 F.2d 357, the warlike restraint here involved is determined as a matter of law to be the responsible—the proximate cause—of the loss by Quinn of his life.

### Conclusions of Law

1. The S. S. Maunawili was at the time here involved in a wartime convoy under the direct control of the United States Navy.

2. The vessel and its crew, of which Quinn was a member, were at the time in question due to the Navy imposed total blackout under a warlike restraint.

3. That warlike restraint was the proximate cause of Quinn's loss of life.

Judgment for the libelant in the sum of $5,000, plus interest from the date of suit will be signed on presentation.

In accordance with Article 20 of the policy, an attorney's fee of 25% is allowed.