## SUTTON v. UNITED STATES.
### No. 24447.

District Court, N. D. California, S. D.
Sept. 30, 1947.

Fred Herrington, of San Francisco, Cal., for libelant Floss I. Sutton.

Frank Hennessey, U. S. Atty., and C. Elmer Collett, Asst. U. S. Atty., both of San Francisco, Cal., for respondent.

HARRIS, District Judge.

Libelant, as the widow and designated beneficiary of her deceased husband, Captain Edgar Sutton, seeks recovery of death benefits as provided in the Group Life and Disability Insurance Policy issued by respondent, known as Second Seamen's War Risk Policy (46 U.S.C.A. § 1101 et seq.) as amended March 24, 1943.

The facts giving rise to the controversy, briefly stated:

Decedent's vessel, SS. Hall Young, while under his command and as it was docked at the Port of Darwin, Australia, was subjected to a swift and unexpected enemy attack and aerial bombardment by Japanese planes and bombs (12 to 14 bombers).

During the seven months period from April 15, 1943, to November 9, 1943, decedent's vessel was required by military and naval orders "to sail in convoy and otherwise and under threat of attack to proceed without lights or other peacetime aids to navigation."

The evidence established that deceased was compelled to sail from San Francisco in broad daylight, without escort or convoy, with five hatches full of high test aviation gasoline and with a deck load three drums deep; during the 26 days from San Francisco to Brisbane, the decedent received frequent navy reports of submarines in the vessel's vicinity, some as close as 50 miles; that at Brisbane the vessel discharged half the cargo of gasoline and took aboard a half shipload of 500# aerial bombs; that decedent was then compelled to take the vessel with its cargo of gasoline and bombs into the port of Darwin where said cargo was urgently needed by the Australian Air Forces.

That a short time before decedent sailed from Brisbane, Jap bombings had sunk every vessel in the Port of Darwin and that decedent's ship was the first to enter the harbor since that time; that the Jap air forces were located on Timor, only a short distance from Darwin; that the harbor there was full of sunken ships, one of which was lying on its side partly submerged, adjacent to the docks, which made it hazardous and difficult for the decedent to get into and away from the docks, and that on June 17, 1943, while the vessel was thus docked discharging its cargo of high explosives and inflammable gasoline, enemy planes appeared overhead. An air raid alarm was given upon the appearance of the Japanese planes. Thereupon, decedent cleared his ship from

the dock within ten minutes and when the all clear signal was given the vessel proceeded back to the docks and continued unloading.

On June 20th while still performing unloading operations, decedent was notified of another air raid. He cleared his ship from the dock within four minutes by having the line cut with axes and took the vessel at full speed ahead out into the harbor, zigzagging to avoid colliding with sunken ships; that an enemy formation of bombers appeared overhead and bombed the port, one bomb striking the dock and setting fire to and exploding the gasoline which decedent's vessel had unloaded there just moments before. During this air raid, the navy gun crew aboard decedent's vessel engaged the enemy planes with a three inch gun and brought down two of the bombers. A second flight of enemy bombers appeared overhead and dropped bombs on this same occasion. Following the attacks, the vessel again docked and continued unloading.

On June 22nd while still engaged in discharging cargo, another air raid alarm was given, the vessel cleared the docks in six minutes and proceeded, zigzagging and at full speed out of the harbor. Continuously, for a period of over three months thereafter, the vessel, under the active and constant command of the decedent, implemented and assisted our military and naval forces which were then engaged in active combat with the Japanese by serving as a troop ship and by transporting bombs, munitions, navy and army supplies from one area to another within the active battle zones.

During this period decedent made three trips to New Guinea carrying troops and munitions of war to the armed forces who were then fighting on that island.

Decedent had been cheerful, loquacious and in apparent perfect health. Immediately following the Darwin bombings, decedent's demeanor, deportment and disposition underwent a marked change. He became brusque and taciturn with his officers and men and showed definite evidence of being under great nervous and mental strain. He moved his cot to the wheelhouse, slept and took his meals there during the three months period while the vessel was in the battle area.

For many days he spent twenty-four hours on active duty. During this period his vessel was subjected to frequent navigational risks and dangers, such as steaming blacked-out in convoy, passing through narrow and tortuous channels in view of other vessels which had gone on the rocks. Such navigational risks were required to avoid Japanese war ships and submarines; depth bombs were dropped in the vicinity of the vessel on at least one occasion.

Coincident with the events referred to, Sutton became ill. Army doctors were called aboard in September. The Purser, Ferdinand A. Jordan, Jr., testified graphically to the onset of Captain Sutton's illness: "He came down from the bridge and he was just staggering down, his face was flushed. * * *" He suffered pain in his heart.[1] This external evidence with respect to Captain Sutton's demeanor and physical appearance represents the first indication that the activities had created a heart lesion which thereafter became progressively worse, culminating in his death.

After this heart attack, Captain Sutton's condition remained so serious that he was confined to his bunk, unable to walk. He was kept under morphine, during the vessel's return from Brisbane and Sydney, Australia, to San Francisco.

Company officials on learning of the seriousness of Captain Sutton's ailment had ordered the vessel's return.

When the SS Hall Young docked in San Francisco on November 9, 1943, Captain Sutton got out of bed against advice and directed the landing of the vessel. He was so weak that he had to be assisted to the bridge.[2] He was driven home accompanied by a nurse, and was placed under a physician's care. He remained in bed except for a single visit to Doctors Delprat and Bruck, until the fatal attack December 22, 1943.

Respondent's position, in substance, is that Captain Sutton's death was not directly or proximately caused as a result of the foregoing experiences; that there was "*no direct physical contact* with the enemy."

---

[1] Tr. pp. 26, 27 & 28.      [2] Tr. pp. 31 to 33.

Further, it is contended that the deceased was suffering from a "progressive organic heart disease."

The contract of insurance is predicated upon the amendment of March 24, 1943, to the Second Seamen's War Risk Policy (57 Stat. 45, 50 U.S.C.A.Appendix, § 1291) which in material respects reads as follows:

"Art. III 'Risks and Perils': The insurance is for loss of life * * * of the insured directly and proximately caused by risks of war and warlike operations, * * * acts of kings, princes and peoples in the prosecution of hostilities * * * aerial bombardment, or, attempts at, or measures taken in defense of all of the foregoing acts. * * * "

■ The contract in the light of the legislative amendment must receive a liberal interpretation.[3] Quinn v. United States, D.C.1947, 72 F.Supp. 94.

"A policy of liberalism permeates the entire structure of war risk insurance." Howard v. United States, D.C.1939, 28 F. Supp. 985, 987. See, also, Straw v. United States, 9 Cir., 1933, 62 F.2d 757; United States v. Patryas, 9 Cir., 1938, 303 U.S. 341, 58 S.Ct. 551, 82 L.Ed. 883; Cushman v. United States, D.C.1942, 43 F.Supp. 810.

Not only is the policy, in general, to be liberally construed, but specifically proximate cause in cases such as this should be liberally interpreted. Quinn v. United States, supra, D.C., 72 F.Supp. at page 96.

Prior to taking command of the SS Hall Young, Captain Sutton had been subjected to a rigorous physical examination conducted by several doctors on behalf of respondent. Thereafter he was referred to Doctor Edwin L. Bruck, an outstanding specialist in heart disorders, who found, under date of March 15, 1943: "We feel that Captain Sutton has at this time no evidence of an incapacitating heart disease or any evidence of heart disease of any consequence." Doctor Bruck certified Captain Sutton fit for sea duty.

Respondent attempts to impugn this certification and suggests that Sutton was suffering from a "progressive heart disease." This contention is unavailing. Captain Sutton had suffered, in the course of his prior wartime duties, a heart condition described as a "tired heart"; nevertheless, it appears that prior to the examination conducted by Doctor Bruck, he had convalesced for a period in excess of six months and had sufficiently regained his vigor and health to the extent that the medical authorities certified him fit and able for duty.

The trend of the incidents experienced by Captain Sutton in the course of his duties indicates that he was subjected to months of accumulated, long continued and oft repeated emotional and physical stresses and strains. As Doctor Fuller found in his report relied upon by respondent: " * * * Beyond any doubt the heart is affected by emotional disturbances, mental stresses and strains, such as occur in hazardous war work."[4]

The operations engaged in by Captain Sutton and his crew were warlike in character. Commanding a ship loaded with gasoline and munitions, decedent had to traverse submarine infested waters, unload cargo while subject to bombing during a series of air raids and interchange of fire with enemy planes. He hauled munitions in the battle zone to New Guinea while

---

[3] Senate Report appearing in United States Code Congressional Service of 1943, No. 1, pp. 2.10 and 2.13: "Insurance protection for seamen.—Another problem primarily affecting seamen and their dependents is the need of providing more complete protection to seamen and their dependents in case of loss of life or bodily injury to such seamen. Notwithstanding the apparent intent of Congress to provide adequate insurance under the revision to the War Risk Insurance Act approved April 11, 1942 (public law 523, 77 Cong. [46 U.S.

C.A. § 1128 et seq.]), it appears that amendment is necessary to avoid the danger of a denial of insurance benefits in cases of death or injury arising from war conditions not within the strict interpretation of 'war risks'. That term was, of course, not intended to be construed in its most limited and technical sense but rather as commonly understood to cover all risks arising out of the war." Gadsden v. United States, D.C., 54 F.Supp. 151, 156.

[4] Tr. p. 102, lines 1 to 3.

parts of New Guinea were under Japanese control, and enemy action was heavy.

The very statement of 'Captain Sutton's activities, without further discussion, should demonstrate that he was subjected to risks of war and engaged in warlike activities, including attempts at aerial bombardment.

As to proximate cause: Respondent relies principally upon the case of Gadsden v. United States, D.C., 54 F.Supp. 151. This authority is not controlling and is dissimilar on the facts. It appeared therein that the seaman had been suffering from a chronic heart condition over a period of many years; that he had never been certified fit for duty and in fact, it affirmatively appeared from the facts that he was unfit. The only evidence with respect to the causal connection between his death and any warlike activity, centered around an asserted submarine alarm wherein it appeared that the deceased seaman was "scared." The record was barren of any medical testimony demonstrating an aggravation of a preexisting heart condition and there was a hiatus in the proof.

In the instant case, Doctor Bruck, who undertook the original examination of the deceased Captain Sutton prior to his taking command of the SS Hall Young, testified at the time of trial in substance:

In answer to the hypothetical questions of counsel setting forth such experiences of Captain Sutton as attacks by enemy planes, avoidance of submarines, transporting munitions and supplies into battle zones and undergoing severe strain and fatigue, the medical concatenations of war, Doctor Bruck said: "I am very sure that the strain and the unusual physical activities are directly contributing causes to coronary attacks, that is, as a preliminary. I am also very sure that where an individual has had, as we know now, posterior occlusions before we saw him in March, that he would be rendered more liable to subsequent attacks by the same factors as strain, and fatigue and undue physical tiredness and exertion. * * *"[5] Doctor Bruck, in answering a question by the Court as to whether a series of shocking physical events could bring on occlusion, said: "It certainly could be the exciting event in producing an occlusion."[6] Testimony establishing the causative link between the war risks and activities of libelant and his subsequent death was absent in the Gadsden case, supra.

In passing it should be noted that the Court in the Gadsden case was applying the more restrictive provisions of the War Risk Insurance Act of 1942 before its liberalizing amendment.

In Lewis v. Alcoa, D.C., 57 F.Supp. 575, at page 576, the court in disposing of a motion for summary judgment, and in discussing the effect of an immersion on the part of a crew member with its consequent effect upon a preexisting tubercular condition, said:

"Whether the disability due to tuberculosis, for which the plaintiff seeks recovery, was a flare-up of an existing disease or whether it could be, and was independently and solely occasioned by the accident, presents a question of fact the determination of which will largely depend upon *expert medical testimony,* possibly based on a comparison of X-ray pictures taken before and after the accident, or upon other facts not sufficiently disclosed. The record therefore presents an issue of fact to be resolved at a trial, and the motion for summary judgment * * * accordingly must be denied." (Emphasis added.)

The record in the case at bar is fortified by competent medical testimony demonstrating that the instances referred to provided sufficient external force and means operating proximately to create a heart lesion, ultimately resulting in the death of Captain Sutton.

The state of deceased's health with respect to an inactive heart condition cannot bar his recovery. In Lewis v. Alcoa, supra, 57 F.Supp. at page 576, the Court said:

"A mere weakened condition, a predisposition to disease or a condition caused by a previous disease as distinguished from a disease actually existing at the time of the accident will not prevent recovery."

---

[5] Tr. Dr. Bruck's testimony, pp. 26 & 27.

[6] Tr. Dr. Bruck's testimony, p. 31, lines 9–11.

See, also, Silverstein v. Metropolitan Life Ins. Co., 254 N.Y. 81, 171 N.E. 914; Prudential Insurance Company v. Carlson, 10 Cir., 126 F.2d 607; Pineiro v. United States, D.C., 65 F.Supp. 191.

Judgment should be entered in favor of libelant in the sum of $5,000 as authorized by Second Seamen's War Risk Insurance Policy.

Findings of Fact and Conclusions of Law to be prepared in accordance with this opinion.