## ROGEL v. UNITED STATES et al.
### No. A–17585.

United States District Court
E. D. New York.
July 12, 1949.

Richard M. Cantor, New York City, for libellant.

J. Vincent Keogh, United States Attorney, Brooklyn, N. Y. (Benjamin H. Berman, Special Attorney, Department of Justice, Washington, D. C., and Martin J. Norris, Special Assistant to United States Attorney, New York City, of counsel), for respondents.

BYERS, District Judge.

The present problem is to decide whether a peptic duodenal ulcer which became manifest in libellant Rogel during the second of two voyages which he made as a member of the crew of a merchant ship (Benjamin Bonneville, owned by the United States and operated by Coastwise (Pacific Far East) Line as General Agent), out of San Francisco, May 26, 1943, to the South Pacific, entitles him to recover under the disability aspect of War Risk Insurance furnished by the War Shipping Administration.

The issuance of the policy and its terms are not in dispute; the presently material provisions are: " * * * disability (including dismemberment and loss of function), * * * from the perils and causes hereinafter stated, * * *

"Schedule 2. Disability, Including Dismemberment and Loss of Function.

"For disability proximately caused by the risks and perils insured against herein, and which arises within ninety days from the date of the happening of such risks and perils, * * *."

"Stipulations and Conditions.

* * * * * *

"Article 3. Risks and Perils. The insurance is for * * * disability (including dismemberment and loss of function), * * * of the insured, directly and proximately caused by risks of war and warlike operations, including capture, seizure, destruction by men-of-war, sabotage, piracy, takings at sea, arrests, restraints and detainments, * * *, scuttling to prevent capture, aerial bombardment, or, attempts at, or measures taken in defense of, all of the foregoing acts, floating or stationary mines, torpedoes, * * * collision * * * stranding * * *."

"Article 12. Disability and Dismemberment.

"A. Disability. 'Disability' as that term is used in this Policy means incapacity because of injury proximately caused by the

risks insured against herein which necessarily and continuously prevents the insured from performing any and every kind of duty pertaining to his occupation at the time of injury.

\* \* \* \* \* \*

"D. Disability shall not include incapacity directly resulting from bodily \* \* \* infirmity or disease of any kind. \* \* \*."

"Article 21. Notice of Loss and Claim. Notice of disability \* \* \*, and claim for payment therefor under this Policy shall be given to the Administrator within ninety days after the happening of the event causing the disability \* \* \*, or ninety days after the insured returns to the continental United States. \* \* \*

"Article 22. Limitation of Suit. No action or suit upon this Policy shall be valid unless commenced within two years from the time the insurance, benefits or allowances conferred by this Policy are payable \* \* \*."

(Note: As to this limitation, no question arises; Rogel arrived back in the United States on March 25, 1944, and signed off on the 31st. This libel was filed August 30, 1945.)

"Article 24. 'Administrator' Defined. Wherever the term 'Administrator' is used in this Policy that term shall include the person who is the Administrator of the War Shipping Administration at the time of the issuance of this Policy and his successor or successors in office, and such other person or persons employed by the Administrator, the War Shipping Administration, or the United States of America, in the War Shipping Administration to whom the Administrator may delegate duties or powers for the administration of the insurance. \* \* \*."

It seems necessary to state briefly how the obligation to provide insurance arose, and how the duty was performed, in order to pass upon the validity of the defense pleaded by amendment introduced at the trial concerning Rogel's failure to give the notice called for by Article 21 quoted above.

The Shipping Articles which he signed contain the following:

"It is also agreed that These articles are subject to the provisions and stipulations of the Maritime War Emergency Board Decisions Nos. 1 to 9 inclusive, together with any and all amendments, revisions and supplements thereto and all subsequent decisions which may apply, copies of which are filed with the United States Shipping Commissioner."

It would require special understanding on the part of a seaman to apprize him that the foregoing has to do with a policy of war-risk insurance.

The decisions, thus incorporated by reference, have been submitted and they disclose a ruling that each member of the crew of a merchant vessel (such as the libellant's) shall be insured against disability due to risks of war or warlike operations.

The applicable provisions of that insurance have been quoted, but for reasons which will readily occur, no policy, certificate or other specific document was issued in connection therewith to the libellant. Nor does the evidence disclose any showing that he knew or was chargeable with knowing that he had to give notice of claim under the policy, within the 90-day period specified in Article 21 of the policy.

It is a general principle of the law that in order to recover under such a policy issued to an individual, failure to give the notice therein specified is fatal to the plaintiff's cause: MacKay v. Metropolitan Life Ins. Co., 281 N.Y. 42, 22 N.E.2d 154; Titus v. Travelers Insurance Co., 268 App. Div. 802, 49 N.Y.S.2d 203; Walterman v. Mutual Benefit Health & Accident Ass'n, 260 App.Div. 478, at page 480, 23 N.Y.S.2d 158; and Maryland Casualty Co. v. Massey, 6 Cir., 38 F.2d 724, 71 A.L.R. 1428, are some of the decisions to the effect stated.

The necessity for some such requirement as that stated in Article 21 is too plain for discussion; it seems equally clear that the Government is at least as much entitled to the protection which it affords as a private insurer. Since, however, this is a matter of contract, it is further to be remembered that Rogel was not made aware of any of its terms; he is not shown to have been put on notice that a 90-day notification was required of him if he were to be heard to assert his claim. Thus his position was not that of a person who had acquired a con-

tract which he could read and measurably understand (assuming such to be the purpose of an insurance policy).

Under these circumstances it seems to me that the Court should not summarily dismiss his cause without inquiry as to what notice, if any, was actually given, upon the theory that, as to this clause of a war-risk insurance policy, the ends of justice will be served if substantial performance can be shown, having in mind the preservation of opportunity to the insurer to make prompt and revealing investigation of all matters affecting the claim.

What happened was this: On June 30, 1944, namely, 97 days after Rogel arrived back in San Francisco, and 91 days after he signed off at that place, he wrote to the operating agent for the War Shipping Administration of his ship, asserting his disability. It does not appear that such operator fell within the definition of Administrator quoted from Article 24 above, at least in a technical sense. It is a reasonable inference, however, that the notice served a practical purpose, for in the acknowledgment of the letter under date of July 5, 1944, this occurs: "Unfortunately, this is the first information we have of your disability and as no report has been received from the vessel covering same, we find it necessary to communicate with the Master for verification of the conditions mentioned in your letter. * * * In the meantime, we suggest that you obtain an abstract of the clinical record from the United States Marine Hospital and forward same to us so we may be in a position to act promptly upon receipt of the Master's report."

Had Rogel followed the technically correct method of filing his claim with the Administrator, say within 60 days from March 25, 1944, it may be doubted if the Government would have learned any sooner than it actually did, what the claim was all about. It is likely that, by the time an inquiry had gone forward from Washington to the operating agent in San Francisco, at least as much time would have been consumed (administrative procedures being what they are), as was actually involved in the course that Rogel pursued, of writing to the operating agent direct. The latter probably made its report to headquarters exactly as soon as if the first request for information had come from the War Shipping Administration instead of from the claimant. This is conjecture of course, but to this Court it is a reasonable one.

 In other words, I cannot conclude that the Government was embarrassed by any such delay in the assertion of this claim as the evidence discloses. In consequence, it is held that the requirement of Article 21 was substantially performed, and within the facts in this record, that is all that was necessary. Other factual situations would have to be dealt with according to their own requirements.

If this ruling is clearly erroneous, the libel would have to be dismissed and the claim would not require consideration on the merits.

For the sake of completeness, the matters in controversy will be briefly discussed: When Rogel signed off he sought medical advice, and eventually became a patient of the U. S. Public Health Service in Los Angeles, having reported on April 12, 1944. His diagnosis was: "Peptic (duodenal) ulcer. * * * Unfit for sea duty for coming 60 to 90 days. Prognosis Favorable."

It is found therefore that such was his physical condition on April 15, 1944. The theory of his cause is that the ulcer is a disability within the terms of the policy, and that it was caused by "risks of war or warlike operations".

In order to support that contention, he relied upon (a) his recital of the incidents of the voyage in question and (b) medical testimony, that is, the statements of his family physician who first examined him on September 9, 1944.

The doctor concurred in the diagnosis made as above stated. He conducted five or six subsequent examinations, without objective findings, and for the period between the first examination and November 28, 1945, found the patient suffering from pains and slight burning sensation in the stomach, and some vomiting. The patient was given suitable medication and put upon an ulcer diet.

The doctor testified that in his opinion the libellant's life on shipboard during this voyage as Rogel described it could be the competent producing cause of the ulcer; also that a pre-existing condition, if present, could have been responsible, and the life on shipboard, under the conditions shown, could have contributed in part to the ultimate development.

Finally, that he could not state any exact incident or happening on the ship, which caused the ulcer.

■ This showing is deemed to be insufficient to establish the libellant's claim for relief, for the following reasons:

Nothing is shown concerning the cause of peptic ulcer and consequently there is no opportunity to trace the effect back to a cause. Cases in which coronary or pulmonary known conditions have been held to have been adversely affected by identifiable episodes, are of no assistance here, where reliance is had upon continued exposure to the hazards of navigation in an area in which war was being waged in the air and under water, but no combat conditions involving this vessel have been revealed. On repeated occasions the libellant was alerted, as were all members of the crew, to serve ammunition to the armed guard who manned the ship's guns, but the latter were never fired. On one or more occasions bombs from air craft fell in adjacent waters, but there was no damage to libellant's ship. True, her mission was hazardous, for she carried ammunition and war materiel, and on occasion troops, into various places in the South Pacific, and she was exposed to all the risks and perils of such a voyage, for which war-time wages and a bonus were paid and fully earned. Such conditions called into play all the tensions of any man's nervous system, but whether that in turn affected secretions and thus induced the presence of an ulcer; or whether a latent condition existed and was thereby kindled into activity; or whether the libellant's digestive apparatus was adversely affected by other conditions (such as those of diet), is entirely a matter of speculation, so far as this record is concerned. The result is that there is nothing in the evidence which would support an affirmative finding in libellant's favor.

The cases cited for him have been examined, and seem to fall short of sustaining his cause:

Sutton v. United States, D.C., 73 F.Supp. 996, concerning the death of the Master of a merchant ship which was exposed to the conditions here shown, but of greater intensity, was capable of being traced to a specific collapse during the month of September, 1943, in connection with which Army doctors were called, and following which he took to his bunk and left it only once. He succumbed to a final heart attack while a bed patient on December 22, 1943.

The nearest approach in this testimony to a specific date or incident is the libellant's statement that he became frightened, nervous and fearful for his life and lost his appetite following a big air raid on January 29, 1944. "I was just scared stiff."

There is nothing to connect that entirely justifiable reaction, to the peptic ulcer, except conjecture.

Quinn v. United States, D.C., 72 F.Supp. 94: Decedent was held to have been swept overboard while at sea, proceeding under blackout in a convoy. The latter was held to have been a warlike restraint, within the policy. To like effect is Murphy v. United States, D.C., 66 F.Supp. 260. Whether these decisions can survive Crist v. United States War Shipping Administration, 3 Cir., 163 F.2d 145, need not be discussed.

Runci v. United States, D.C., 82 F.Supp. 523: Heart condition manifested on voyage on the Murmansk run. "* * * the deceased exhibited many signs of increasing tension and nervousness. He lost over twenty pounds during the period of the voyage which was about four months * * * and exhibited signs of being in a tired and worn-out condition."

There is no such testimony here. The cited case does not involve the provisions above quoted from the policy touching disability resulting from "bodily * * * disease of any kind". I should suppose that a latent peptic ulcer, which libellant's physician said could have been present, would have to be ruled out if recovery were to be had.

Lewis v. Alcoa S. S. Co., Inc., D.C., 57 F.Supp.575, 576: Here it was decided that a question of fact was presented concerning a tubercular condition, as to whether it "was a flare-up of an existing disease or whether it could be, and was independently and solely occasioned by the accident". The latter involved a striking of the injured seaman by a life raft, after he had jumped overboard as the result of a submarine attack upon his ship.

The instant case has been considered as presenting an issue of fact, and the libellant's cause has been deemed too deficient in testimony to support it.

It is not intended to place this decision upon the ground that warlike operations within the intent of the policy have not been demonstrated. It is thought that the subject is not reached.

The failure on the libellant's part is to trace the peptic ulcer as observed on April 15, 1944, to any specific cause arising during the voyage in question, other than conditions which he must be deemed to have contemplated when he signed articles for this second voyage.

Decree for respondents without costs, to be settled on notice. If findings are desired, they should be noticed for settlement with the decree.