### CRIST v. UNITED STATES WAR SHIPPING ADMINISTRATION.

#### No. 57.

District Court, E. D. Pennsylvania.

Jan. 15, 1946.

Freedman, Landy & Lorry and Abraham L. Freedman, all of Philadelphia, Pa., for plaintiff.

Charles R. Sheidy, Jr., Asst. U. S. Atty., of Reading, Pa., Arnold W. Knauth, Head Atty., Claims Div., Department of Justice, of Washington, D. C., and Howard F. Fanning, Sp. Asst. to U. S. Atty., of New York City, for defendant.

WELSH, District Judge.

This is an action by the libellant to recover war risk insurance for the death of her son, Theodore W. Ellse, an American merchant seaman, under the rules and regulations of the Maritime War Emergency Board.

The decedent, Theodore W. Ellse, was in the employ of the Waterman Steamship Corporation as a member of the crew of the Steamship "Maiden Creek", a vessel documented under the laws of the United States. The "Maiden Creek" which was carrying high test gasoline departed in convoy from New York about October 8, 1942, bound for Greenland. She arrived at this latter place on October 28th, and thereafter the convoy was re-formed, some vessels continuing to the British Isles, others taking a southerly direction bound for Newfoundland and the United States. At the port of Botwoodszille, Newfoundland, ore concentrates were loaded aboard the "Maiden Creek". She then proceeded to St. John, Newfoundland, where she was ordered into a convoy bound for New York. On this portion of the voyage the vessel encountered severe weather. She began to labor, and when it became apparent that she could not keep up with the convoy, the vessel was instructed to change course and proceed to Halifax, Nova Scotia, to replenish the supply of fuel as well as to temporarily seek shelter. When the vessel entered the port of Halifax, it was down by the head with the forepeak and chain locker filled with water. The water in the forepeak was pumped out, but the vessel remained down by the head on an uneven keel with part of the rudder and propeller showing in the stern. Without any repairs having been made, the "Maiden Creek" was ordered to join a convoy at a specific time en route to New York. Before departing,

the captain of the vessel had received his instructions at a convoy conference under the supervision of the military authorities. On December 31, 1942, while the convoy was proceeding from Halifax to New York, it encountered a storm and heavy seas, and as a result the "Maiden Creek" began to labor very heavily. Because of these internal and external difficulties described above, the "Maiden Creek" began to lose headway and fell behind the convoy. She thereupon sent out a distress call and was answered by another merchant vessel, the "Exhibitor", which agreed to stand by and take aboard the crew of the "Maiden Creek". While the "Maiden Creek" was being abandoned and her seacocks opened so that she would sink and not be a hazard to navigation, the "Exhibitor" because of the fear and imminence of enemy craft in the vicinity steamed away, leaving the crew of the "Maiden Creek" in two life boats somewhere in the North Atlantic. One of these life boats containing libellant's intestate among others was lost at sea with all hands.

Libellant contends that Theodore W. Ellse was lost as a result of a risk of war and warlike operations and in defense it is argued that the cause of the death was a marine peril not covered by the insurance policy and that our decision should be governed by Queen Insurance Company v. Globe & Rutgers Fire Insurance Company, 1924, 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402, and other similar cases.

Under Decisions Nos. 1 and 2 of the Maritime War Emergency Board, the crew of American Merchant vessels were required to be insured against loss of life due to "risks of war and warlike operations" and the policy prescribed by supplement to Decision No. 1 of the Maritime War Emergency Board provides against loss of life due to "capture, seizure, arrest, restraint and detainment and other warlike operations and acts of kings, princes and people in prosecution of hostilities. * * *"

 The record is replete with testimony tending to show that the military authorities exercised complete control over the convoy which included the "Maiden Creek". The latter could only leave port under the direction and supervision of the naval escort. The Master was required to attend convoy conferences for instructions concerning the navigation and control of his vessel. The Master could exercise no discretion, he had to leave in convoy pursuant to a definite plan which required the vessel to hold a certain position in the convoy and maintain a course as directed by the Naval escort. A Navy gun crew was aboard the "Maiden Creek" as well as on every other American vessel which put out to sea during wartime. The "Maiden Creek" was forced to put to sea in an unseaworthy condition and ordered to maintain a specified speed and course in the convoy. That these enumerated compulsions and controls constitute a "restraint" as provided for in the supplement to Decision No. 1 of the Maritime War Emergency Board is we think too clear to require much more than mention. In this connection, however, it must be stated that proof of a "restraint" does not per se entitle a claimant to the benefits of war risk insurance. Proximate cause between the "restraint" and the injury or death as the case may be must be shown. Therefore, the sole question is whether the death of Theodore W. Ellse was proximately caused by the "restraint" imposed by the military authorities, or by an ordinary sea peril. In Muller v. Globe & Rutgers Fire Ins. Co. of New York, 2 Cir., 1917, 246 F. 759, 762, it was stated: "That cause is proximate which sets the other causes in motion; only when causes are independent is the nearest in time looked to. * * * If there is an unbroken connection between act and injury, the act causes the injury; an intervening act is not the proximate cause of injury, unless it is efficient to break the causal connection." Using these principles as guides we hold that the proximate cause of the death of the seaman, Theodore W. Ellse, was the "restraint" imposed on the "Maiden Creek" by the authorities and that all subsequent acts—the departure of the "Maiden Creek" in an unseaworthy condition from the port of Halifax en route to New York, her laboring and falling out of convoy, the breaking open of her seacocks, the "Exhibitor's" fear of enemy submarines and abandonment of the "Maiden Creek", her sinking, and finally the loss of the seaman in a life boat—were the consequences of that act. It would appear therefore that the death of Theodore W. Ellse was purely the result of a war risk or a warlike operation and not the result of a maritime peril. Our conclusion is supported by the authorities which show a tendency toward construing what is the proximate cause liberally in favor of the seaman or his beneficiary. In Standard Oil Company of New Jersey v.

United States of America, 1925, 267 U.S. 76, 45 S.Ct. 211, 212, 69 L.Ed. 519, Mr. Justice Holmes said: "Whatever happens while the taking insured against continues fairly may be attributed to the taking." There the Court had before it a "seizure", here we have before us a "restraint". However, we think the distinction is not material.

In his brief counsel for the United States cites several cases in support of his argument. Nordling v. Gibbon, D.C.S.D.N.Y., 62 F.Supp. 932, 1945 A.M.C. 1060, held the fact that one of the vessels involved in the collision was carrying a cargo of invert molasses owned by Defense Supplies Corporation and which had it not been lost would have been manufactured into alcohol, which in turn would have been manufactured into smokeless powder, did not convert it into a warlike operation. This case merely states that the nature of a ship's cargo does not per se characterize an operation as warlike. We are in complete accord with that principle but we fail to perceive how the respondent can derive solace from that fact as our opinion in the case at bar is not affected by the nature of the ship's cargo. As the case of Clan Line Steamer v. Liverpool & L. War Risk Ass'n, (1942) 58 T.L.R. 369, 73 Lloyds L.R. 165-169 (King's Bench), is similar to the above cited case further comment is not necessary. The respondent relies to a great extent on the decision in Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co., supra. But that case is distinguished from the instant case in several respects. There the Court which was confronted with the construction of clauses in a maritime insurance policy excepting "all consequences of hostilities or warlike operations", and in a war risk insurance policy insuring acts "authorized by and in prosecution of hostilities", stated that the settled rule of construction is "that in construing these policies we are not to take broad views but generally are to stop our inquiries with the cause nearest the loss". Secondly, it concluded, without deciding whether or not the situation involved a war risk or warlike operation, that as between the marine insurer (libellant) and the war risk insurer (libellee) the liability should fall on the former because the nearest cause of the loss was a marine peril. Lastly, and most significantly, the element of compulsion which is present here was lacking in Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co., supra [263 U.S. 487, 44 S.Ct. 176]. On account of the importance of this point we quote a brief excerpt from the latter opinion as follows: "At Gibraltar she joined a convoy, as it was practically necessary to do although not ordered by the military powers."

Counsel for libellant argues that the "Exhibitor's" Captain's fear of enemy submarines brings the case within the scope of the supplement to Decision No. 1 of the Maritime War Emergency Board in that the situation created thereby constitutes a "warlike operation". It is undisputed that the "Exhibitor's" Captain feared enemy craft in the vicinity. The Captain testified that when they first observed the "Maiden Creek" she was down by the head and looked as though she had been torpedoed. The Captain further testified that he instructed the crew of the "Maiden Creek" to abandon ship before dark and that he would not wait after dark because of the fear of submarines. The fact that the "Maiden Creek" had broken radio silence also made the Captain apprehensive, for he knew that her position was known to enemy vessels. Pelton, Third Officer of the "Exhibitor", admitted that the "Exhibitor" left the "Maiden Creek" to its own fate because of fear of enemy submarines. The respondent's answer to this argument emphasizes that the policy extended to the "Maiden Creek" and her crew and it did not extend to other ships and other people; the fears referred to were the fears of the "Exhibitor" and her crew. In the light of the discussion above in which we determined that the "restraint" of the military authorities proximately caused the death of the seaman and that the fears of the "Exhibitor" were a consequence of that act, we are not inclined to pass judgment on this phase of the matter.

 The respondent's contention that the libellant has not made out a case at all because she failed to produce a single witness at trial or to take depositions of any person is wholly without merit. The libellant met her burden of proof and thus made out a case by presenting as evidence the depositions of Wilson, Pelton and Connolly which were taken by the respondent. Rule 26 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, and its companion Rules authorize the taking of depositions for the purpose of discovery and also for the purpose of evidence at trial. Rule 26(d) (3) provides

that the deposition of a witness, whether or not a party, may be used by any party for any purpose including for the purpose of evidence at trial if the Court finds the existence of any one of five enumerated conditions. Since at the time the depositions were offered in evidence the respondent interposed no objection it is presumed by the Court that at least one of these enumerated conditions existed or that the depositions were offered in evidence by agreement of the parties. In any event it is clear that the depositions were properly admitted and that the libellant proved her case.

The prayer of the libel is accordingly granted.

Libellant is directed to promptly prepare findings and decree in accordance with this opinion.