## FERRO v. UNITED STATES LINES CO.
### et al.

### SAME v. UNITED STATES.

District Court, S. D. New York.
July 8, 1947.

Dow & Symmers, of New York City (Daniel L. Stonebridge and John R. Sheneman, both of New York City, of counsel), for libelant.

John F. X. McGohey, U. S. Atty., of New York City (Kirlin, Campbell, Hickox & Keating, of New York City, and Bertram G. Eadie, Sp. Asst. to U. S. Atty., of St. George, N. Y., of counsel), for the United States.

Kirlin, Campbell, Hickox & Keating, of New York City (Raymond Parmer, of New York City, of counsel), for United States Lines Co.

LEIBELL, District Judge.

On February 18, 1944, the libelant, as administratrix of the estate of William Ferro, a deceased seaman, filed a libel

against the United States Lines Company, as general agent for the War Shipping Administration and against the United States as owner of the Steamship Cape Ugat to recover for the death of the seaman, alleging that the respondents negligently failed to take proper and timely measures to effect the deceased's rescue after he had fallen overboard at sea. On August 29, 1946, the libelant filed an amended libel herein, adding a second cause of action based upon a policy of Crew War Risk Insurance. Later, on October 10, 1946, by an order of the Court pursuant to a stipulation entered into by the attorneys for all parties, this amended libel was withdrawn and the original libel and subsequent pleadings directed thereto were reinstated, to have the same force and effect as if the amended libel had never been filed. Then on October 15, 1946, the libelant filed another libel, as beneficiary of a policy of Crew War Risk Insurance, against the United States, alleging that "the loss of life of William Ferro, deceased, was due to the warlike operations of the S. S. Cape Ugat and the mental strain of deceased produced through continuous service in war areas, as a result of which the deceased became mentally unbalanced and disappeared from the vessel."

The libels were consolidated for trial and on January 8, 1947, a trial of the issues was had. Most of the testimony was submitted in deposition form. The trial was reopened in June to receive the deposition and affidavit of two members of the crew, which the Court suggested be obtained to complete the record.

Salvatore William Ferro was serving on board the S. S. Cape Ugat as Third Assistant Engineer on its second voyage. The vessel sailed February 22, 1943, following a route from New York via the Panama Canal to Australia, then to the Persian Gulf and India in the Middle East, and return via Australia. On July 14, 1943, the vessel was on another leg of its return voyage, having left Australia bound for the Panama Canal. This long voyage was made by the S. S. Cape Ugat during wartime, alone and unescorted by combat vessels, at times through areas where she was open to attack by submarines and airplanes. The ship was traveling under wartime restraints, which included blackout conditions at night to avoid observation by the enemy.

During the course of this voyage the crew engaged in certain wartime tests and drills. The log of the S. S. Cape Ugat indicates that these drills were held at intervals of once or twice a week. A typical entry in the log concerning the drills appears as follows:

"1:10 P.M. Crew exercised at battle station, all guns and stations manned. 1:18 Fire stations, Tested 6 lengths of hose under pressure, tested water tight doors, emergency generator. 1:24 Boat Stations, instructed crew in their duties and adjustment of their life belts. All boats lowered to the rail. 1:23 Secured all stations. All gear in good working order."

It also appears that during some of these drills the Armed Guard Naval crew fired the ship's guns in practice. Although the log contains no reference to sightings, the testimony indicates that once during the westward part of the voyage a periscope was reported sighted and fired upon by the Armed Guard crew. It was also shown that a few unidentified planes were sighted during the voyage, as well as some other ships.

There is no evidence as to the nature of the cargo of the Ugat and it does not appear that she was carrying dangerous goods.

William Ferro, as Third Assistant Engineer, in the course of his duties, stood regular engine room watches of four hours duration and would then be off watch for eight hours before resuming his duties in charge of the next watch. His associates testified that Ferro was competent and efficient in the performance of his duties, that he was affable towards other members of the crew, and that he did not give any indication of abnormality or emotional instability. The Chief Engineer testified that Ferro "worried quite a bit," that "he worried more about the engines than I did," but that he had observed nothing unusual in Ferro's character prior to July 14, 1943. The First Assistant Engineer, Eugene W. Hearn, testified that "Mr. Ferro used to go off by himself and just sit there and think,

I guess," and that he was "a little on the moody side."·

Ferro, the deceased seaman, was friendly with the Merchant Marine Cadets, who were on board the Ugat for training purposes. They stood engine room watches with him and he assisted them with various problems in the course of their studies. During this association Ferro talked freely with the cadets and they testified that they never observed any abnormalities in his conduct. One cadet, George W. Drennan, testified that he went ashore on several occasions with Ferro and others and that Ferro always acted in a "normal way" and did not misconduct himself while ashore.

On the morning of July 14, 1943, Ferro stood the 12:00 A.M. to 4:00 A.M. watch and at about 4:00 A.M. he complained to Drennan that he was not feeling well. A few minutes later Drennan, who had gone to the salon for coffee, met Ferro again as he came in. Ferro said "I guess I'm just a coward" and crossed the salon to enter the First Assistant Engineer's stateroom. Hearn, the First Assistant Engineer, testified as follows with respect to what occurred thereafter in his stateroom:

"I remember his coming into my quarters and putting the light on. Of course, I woke up. Of course, I first thought something had happened in the engine room, and well, I found out everything was all right. I sort of just laid there and he sat down. He was on the moody side. So he was talking about things, he could not sleep. I suggested he go to bed or something like that and forget about it. So he sat at my desk awhile talking. I was dozing on and off and just coming in, you know, because I knew that there was nothing wrong in the engine room. So, I do not know, I just happened to wake up the one time, and he got up from my desk and he went out, and just about that time I figured out what was the trouble with him, I went out * * *."

Later, in answer to some specific questions about whether Ferro indicated that he was disgusted with life, he said:

"No, he was disgusted with the mail situation more than anything. He was brooding about that."

"I recall asking him several times what was the trouble, what seemed to worry him, but I really could not get anything definite, except he was worried about the mail situation more than anything else. That seemed to be the main thing."

This is not a completely satisfactory account of Ferro's conduct during the four or five minutes he was in Hearn's stateroom; although it must be considered that Hearn, just awakened from a sleep, was still in a drowsy condition.

Ferro came out of the First Assistant's room and hurriedly made his way to the salon door that opened onto the port boat deck. As he went out he slammed the door and a moment later Hearn emerged from his stateroom and called to the two cadets who were sitting in the salon, "Catch him." They tried to open the door to the port boat deck but it had locked or jammed and Hearn and the cadets went out the door on the starboard side and crossed over to the port boat deck. They saw no sign of Ferro and at Mr. Hearn's direction instituted a search of the deck and some other parts of the ship. That search proved fruitless. Hearn then awakened the Chief Engineer who ordered a search of the whole ship. Hearn explained the search as follows:

"Well, at times there Mr. Ferro used to go off by himself and just sit there and think, I guess. So I did not know, of course, I wanted to find out what the trouble was he really left so abruptly. I thought maybe he was hiding somewhere or went somewhere else. So I thought let us look us around to find him and straighten him out a little bit."

The search instituted by the Chief Engineer was to no avail. During this search the Chief Engineer was told by a member of the Armed Guard crew on watch at the stern of the vessel that he had heard a "strangling noise" in the water a short while before. There was a ventilator in the vicinity of the gunner's post which made a "hissing" sound irregularly. Upon inquiry it appeared that the gunner was not certain whether or not the noise he had heard was caused by the ventilator, although it does appear that it was a different type of sound. The distance from the

gunner's station to the boat deck was about "125 to 160 feet." There is nothing in the record as to the direction of the wind at the time the gunner heard this "strangling" or "gurgling" sound; but it does appear that there was a strong wind, that there was a heavy confused swell, and that the vessel was rolling and pitching heavily. Under these circumstances the Chief Engineer testified that, in his estimation, a cry from the water could not have been heard by the gunner.

The search instituted by Hearn had started at approximately 4:30 A.M. and was continued by the Chief Engineer from 4:45 to 5:15 or 5:20 A.M. when he was informed of the noise heard by the gunner. At 5:25 the Chief Engineer notified the Captain of Ferro's disappearance. The ship was put about at that time and proceeded on a reverse course and searched the area for about two hours. During this time the Captain ordered additional men to continue searching the ship for Ferro and at about 6:10 they were alerted to be on the lookout in the water. Ferro was never found, but the next day some black smudges, which appeared to have been made by shoes, were found on the middle and top rung of the life rail on the boat deck just outside the port doorway to the salon. The ship's log contains the following entry for July 14, 1943:

"Small sea. Heavy confused swell. Vessel rolling and pitching heavily. 0525 Salvatore W. Ferro 3rd Assistant Engineer Article #21. Identification #267533 Reported missing. Vessel searched. 0530 Came about on reverse course. 0630 Extra lookouts. Various courses in vicinity of his disappearance. 0830 gave up search. Presumed lost. Resumed voyage. * * *"

In Russell v. Merchants & Miners Transp. Co., D.C.E.D. Va. 1937, 19 F. Supp. 349, 350, where it appeared that a seaman was incapable of taking care of himself after suffering an epileptic fit and was left alone on deck by the seaman attending him, the court said:

"* * * the court would hesitate to hold that any of them was so ignorant and inexperienced as not to be able to appreciate the necessity of restraining and guarding a man in his condition until he regained mental composure and the ability to care for himself. Allowing him to break away from them and go aft unassisted and unprotected under the circumstances was clearly negligent failure to care for and nurse an ill seaman and the sole proximate cause of his drowning."

In Batkiewicz v. Seas Shipping Co., Ltd., D.C.S.D.N.Y.1945, 66 F.Supp. 205, 1946 A.M.C. 441, the Court held that if a passenger shows signs of mental instability and tendency to suicide the Master is under an obligation to guard or restrain him; and that the carrier is liable in damages for the passenger's death by suicide if there is a failure or neglect to provide adequate safeguards under the circumstances.

■ It is clear that if Ferro showed any signs of mental instability which could reasonably have led the Master or his associate officers to believe that there was danger that he would do harm to himself, they were obligated to take proper measures to prevent such an occurrence. However, the record in this case does not reveal the presence of any incident which would have put the respondents or their agents on notice. At best it appears that Ferro was occasionally "moody" over the mail situation. At all other times he was normal and steady. While it is not altogether clear what Ferro said in Hearn's stateroom just before his disappearance, it does not appear that in those few minutes he said anything which should have roused Hearn to restrain him at the moment. Probably, the slamming of the door opening on the boat deck did arouse Hearn's suspicions when coupled with something that Ferro had said as he left Hearn's room. Perhaps Hearn then feared Ferro might do himself harm. Hearn acted promptly. He jumped out of bed and called to the cadets in the galley in an effort to "catch" Ferro. They searched the deck and the ship and later turned the vessel back on her course to the point where she was when Ferro disappeared. The respondents did not violate any duty to restrain or safeguard the deceased seaman herein.

■ Nor does it appear that they should be charged with a violation of the duty to

rescue, or to take proper and efficient means to effect a rescue, of a seaman who has fallen overboard from any cause whatsoever. Cortes v. Baltimore Insular Line, Inc., 1938, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368; Harris v. Pennsylvania R. Co., 4 Cir., 1941, 50 F.2d 866. Neither the Master, the officers or other members of the crew knew at this time that Ferro had fallen or jumped overboard. While Hearn had some basis for seeking out Ferro to "straighten him out a little" there is nothing to indicate that he had reason to believe Ferro had gone overboard. The intensive search of the ship negatives that idea. Unless there was reason to believe that Ferro had gone overboard there was no neglect in failing to turn the ship about at once. When the search proved fruitless, at 5:25 A.M., and the Master was informed, the ship reversed its course, stationed extra lookouts and cruised in the vicinity for over two hours. After it was realized that Ferro must have jumped overboard, nothing was omitted which was reasonably practicable in an effort to locate him and effect a rescue.

The libel based upon the negligence of the respondents should therefore be dismissed.

At the time Ferro disappeared from the vessel he was covered by a Crew Life and Injury Insurance Policy, and, at his beneficiary's option, he came within the coverage of the Second Seaman's War Risk Policy. Both policies were substantially the same, except that the latter contained somewhat broader and more beneficial provisions in the perils clause thereof. The first policy insured seaman:

"Against loss of life * * * directly occasioned by capture, seizure, destruction by men of war, piracy, takings at sea, arrests, restraints and detainments and other warlike operations, (including collisions in convoy * * *) and acts of Kings, * * * in prosecution of hostilities * * *, and including the risks of aerial bombardment, floating or stationary mines and stray or derelict torpedoes."

"Against loss of life * ˙ * * directly occasioned by warlike operations * * * directly and solely occasioned by accidental external means. · Nothing herein shall be construed to cover claims by any member of the vessel's personnel arising from his own misconduct."

The second policy, the Second Seamen's War Risk Policy, contains the following terms in its perils clause:

"The insurance is for loss of life * * directly or proximately caused by risks of war and warlike operations, including capture, seizure, destruction by men of war, sabotage, piracy, takings at sea, arrests, restraints and detainments, acts of Kings, * * * aerial bombardment, or, attempts at, or measures taken in defense of, all of the foregoing acts, floating or stationary mines, torpedoes * * *, collision caused by failure, in compliance with wartime regulations * * *."

The clause also contains the following paragraph:

"The fact that a vessel, or any vessel with which such vessel is in collision is carrying troops or military or other supplies, or is proceeding to or from a war base, or is manned or operated by military or naval personnel, shall not alone be sufficient to include in this policy any claim which is not included by the foregoing terms of this Article."

The Ugat was obviously traveling under certain restraints during a time of war. She was sailing under U. S. Naval instructions, involving conditions of radio silence and a black-out at night. She was armed and carried a naval gun crew. Murphy v. United States, D.C.E.D.Pa.1946, 66 F. Supp. 260; Crist v. United States War Shipping Administration, D.C.E.D.Pa. 1946, 64 F.Supp. 934; Reinold v. United States, D.C.S.D.N.Y.1946, 72 F.Supp. 92. The reported sighting of a periscope and the consequent firing of the guns was undoubtedly a warlike operation. The sighting of unidentified aircraft and the alerts sounded as a result thereof may be classified as a warlike operation. And even the general quarters drills designed to man the battle stations quickly and efficiently may be deemed warlike operations when performed on a merchant vessel at sea in time of war.

In order to form the basis for a recovery under the policy, the restraints and warlike operations must be shown to be the proximate cause of a seaman's injury or death. Crist v. United States War Shipping Administration, D.C.E.D.Pa. 1946, 64 F.Supp. 934. There can be no recovery under the terms of the policy if the injury or death is only remotely or indirectly related to the restraints or warlike operations. The record in this case does not reveal any proximate causal relationship between the restraints and warlike operations enumerated above, and Ferro's death.

It seems almost certain that Ferro jumped overboard on the morning of July 14, 1943, but the reason why he did so was lost with him. There is not a single indication in his words or acts that any of the restraints or warlike operations had any unusual effect upon his emotions or had rendered him mentally unstable, over the five months period of the voyage. Those who were associated with him daily did not testify to any mention by Ferro of the wartime occurrences aboard ship as affecting his mental stability. He did remark in the galley (shortly before his talk with Hearn) that he was just a coward. What that meant is a matter of speculation and surmise. Hearn's testimony stresses the fact that Ferro was moody over the mail situation. To assign any specific cause as the reason for Ferro's action on July 14, 1943, would be mere conjecture.

A similar situation was considered by the Court in Gadsden v. United States, D.C. Md. 1944, 54 F.Supp. 151, where a seaman died of heart disease, after having stated that a "submarine scare" while his vessel was traveling in convoy aggravated an existing heart condition. Judge Chestnut held that the loss of life was not within the coverage of the war risk insurance policy, because there was no sufficient or satisfactory proof that the "submarine scare" was the proximate cause of the seaman's death. In this case the proof is much less substantial. It has not been shown that the claim asserted on behalf of the libelant herein is covered by the perils clause of the policies. The second libel,

based upon the Crew Life and Injury and/or the Second Seaman's War Risk policies, is accordingly dismissed.

In view of the above disposition of the claims on the merits it is unnecessary to pass upon the special defense of the Statute of Limitations raised against the suit on the policy.

Settle a decree accordingly.